IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| STAYCE WHITE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. |
| | ) | |
| | ) | |
| TRIUMPH FOODS, LLC. | ) | REQUEST FOR JURY TRIAL |
| | ) | |
| Defendant. | ) | |

## COMPLAINT FOR DAMAGES

COMES NOW Plaintiff Stayce White ("Plaintiff") and for her Complaint for Damages against Defendant Triumph Foods, LLC, ("Defendant"), and alleges and states as follows:

### Parties and Jurisdiction

1. Plaintiff is a citizen of the United States, residing in St. Joseph, Buchanan County, Missouri, and at all times pertinent to this Complaint for Damages was an "employee" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e(f) et seq. ("Title VII") and the Missouri Human Rights Act, RSMo. § 213.010 *et seq*. ("MHRA").

2. Defendant is a Missouri corporation registered in the State of Missouri and employing at least 15 employees within the United States.

3. Defendant continuously operates offices located at 5302 Stockyards Expressway, St. Joseph, Buchanan County, Missouri.

4. Defendant was at all times pertinent to this Complaint for Damages, an "employer" within the meaning of the Title VII, 42 U.S.C. § 2000e(b) and the MHRA, RSMo. §§ 213.010(8) and 213.010(15).

1

5. The claims within this Complaint are brought under Title VII, a federal statute, the Patient Protection and Affordable Care Act, 42 U.S.C. § 18001 *et seq.* ("ACA"), a federal statute, and the MHRA, a Missouri state statute.

6. Some, if not all, of the alleged unlawful employment practices took place in the State of Missouri, within the territory of the Western District of Missouri.

7. Jurisdiction and venue are proper in the Western District of Missouri pursuant to 28 U.S.C. § 1331, 28 U.S.C. §1391, and 28 U.S.C. § 1637.

## Administrative Procedure and Procedural Posture

8. On or about August 22, 2019, Plaintiff timely filed a Charge of Discrimination dually with the Equal Employment Opportunity Commission ("EEOC") and Missouri Commission on Human Rights ("MCHR") alleging Defendant discriminated against her on the basis of Plaintiff's sex by refusing to provide Plaintiff basic health insurance coverage benefits that would cover the treatment of her medical condition of gender dysphoria.

9. On or about June 3, 2020, the MCHR issued to Plaintiff a Notice of Right to Sue on Plaintiff's Missouri state employment discrimination claim. A copy of said Notice is attached hereto as Exhibit A and incorporated herein by reference.

10. On or about June 4, 2020, the EEOC issued to Plaintiff her Notice of Right to Sue on Plaintiff's federal Title VII claim. A copy of said Notice is attached hereto as Exhibit B and incorporated herein by reference.

11. Plaintiff's Complaint is filed within ninety (90) days of the issuance of the MCHR's and the EEOC's Notices of Right to Sue.

12. The aforesaid Charge of Discrimination provided the EEOC and the MCHR sufficient opportunity to investigate the full scope of the controversy between the parties and, accordingly, the sweep of this judicial complaint may be and is as broad as the scope of an EEOC and/or MCHR investigation, which could reasonably be expected to have grown out of the Charge of Discrimination.

13. Plaintiff has satisfied all private, administrative, and judicial prerequisites to the institution of this action.

### General Allegations Common to All Counts

14. Gender identity refers to an individual's fundamental, internal sense of being a particular gender. It is an essential element of human identity that everyone possesses. Gender identity is innate, has biological underpinnings, and is fixed at an early age.

15. An individual's sex is generally assigned solely on the basis of the appearance of external genitalia at the time of birth. External genitalia are but one of several sex related characteristics and are not always indicative of a person's sex. Other sex related characteristics, such as chromosomes, hormone levels, internal reproductive organs, secondary sex characteristics, and gender identity, are typically not assessed or considered during the assignment of sex at birth.

16. Where an individual's gender identity does not match that individual's sex assigned at birth, gender identity is the critical determinant of sex. A scientific consensus recognizes that attempts to change an individual's gender identity to bring it into alignment with the sex assigned at birth are ineffective and harmful.

17. For transgender people, an incongruence between gender identity and the body's other sex characteristics can result in gender dysphoria—i.e., a feeling of clinically significant

distress and discomfort born out of experiencing that something is fundamentally wrong. Gender dysphonria is a medical condition recognized in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition; the World Health Organization's International Classification of Diseases, which is the diagnostic and coding compendia for medical professionals; and by other leading medical and mental health professional groups, including the American Medical Association ("AMA") and the American Psychological Association ("APA").

18. In addition to clinically significant distress, gender dysphoria can also result in severe anxiety, depression, and suicidal ideation or suicide if not adequately treated.

19. Untreated gender dysphoria often intensifies with time. The longer an individual goes without adequate treatment, the greater the risk of severe harms to the individual's health.

20. Gender dysphoria can be treated in accordance with internationally recognized Standards of Care formulated by the World Professional Association for Transgender Health ("WPATH"). These Standards of Care are recognized as authoritative by national medical and behavioral health organizations such as the AMA and APA, which have called for an end to exclusions of gender confirming care from health insurance plans.

21. The process by which transgender individuals come to live in a manner consistent with their gender identity, rather than the sex they were designated at birth, is known as gender transition. The ability to live in a manner consistent with one's gender identity is critical to the health and well-being of transgender individuals and is a key aspect in the treatment of gender dysphoria.

22. The steps that transgender individuals take to transition are individualized, but typically include social, legal, and medical transition.

23. Social transition entails a transgender individual living in accordance with their gender identity in all aspects of life. For example, for a man who is transgender (designated female at birth), social transition can include wearing typically male attire, using male pronouns, and otherwise living openly as a man in all aspects of everyday life.

24. Legal transition involves steps to formally align a transgender individual's legal identity with their gender identity, such as legally changing one's name and updating the nae and gender marker on their driver's license, birth certificate, and other forms of identification.

25. Medical transition, a critical part of transitioning for many transgender individuals, includes treatments that bring the sex-specific characteristics of a transgender individual's body into alignment with their gender identity, such as counseling to obtain a diagnosis of gender dysphoria, hormone replacement therapy, or surgical care.

26. Hormone replacement therapy involves taking hormones for the purpose of bringing one's secondary sex characteristics into typical alignment with one's gender identity. Secondary sex characteristics are bodily features not associated with external and internal reproductive genitalia (primary sex characteristics). Secondary sex characteristics include, for example, hair growth patterns, body fat distribution, and muscle mass development. Hormone replacement therapy can have significant masculinizing or feminizing effects and can assist in bringing a transgender individual's secondary sex characteristics into alignment with their true sex, as determined by their

gender identity, and therefore is medically necessary care for transgender people who need it to treat their gender dysphoria.

27. Gender confirming surgical care or treatment—also known as gender confirmation surgery or "sex reassignment" surgery—refers to any surgical procedure undertaken by a transgender individual to better align their primary or secondary sex characteristics with their gender identity. Such surgical care can include but is not limited to vaginoplasty, phalloplasty, hysterectomy, gonadectomy, mammoplasty, and mastectomy. These treatments deliberately change sex characteristics for the purpose of treating gender dysphoria.

28. Surgical care is medically necessary for transgender people who need it to treat their gender dysphoria.

29. An established body of medical research demonstrates the effectiveness and medical necessity of gender dysphoria treatment, including counseling, hormone therapy, and surgical treatment. Health care experts have recognized that such treatments are not "cosmetic," "elective," or "experimental." Rather, such treatments are safe, effective, and medically necessary treatments for a serious health condition.

30. For example, WPATH has explained that, like hormone therapy and other gender confirming treatments, "[t]he medical procedures attendant to gender affirming/confirming surgeries are not 'cosmetic' or 'elective' or 'for the mere convenience of the patient.' These reconstructive procedures are not optional in any meaningful sense, but are understood to be medically necessary for the treatment of the diagnosed condition. In some cases, such surgery is the only effective treatment for the condition, and for some people genital surgery is essential and life-saving."

31. Similarly, in 2014, the federal Department of Health and Human Services Departmental Appeals Board confirmed that surgical treatment is safe and effective treatment for gender dysphoria. After reviewing expert medical testimony and published studies, the Appeals Board concluded that the Medicare program's then-existing exclusion of such treatment from coverage was "not reasonable."

32. These various components associated with transition—social, legal, and medical transition—do not change an individual's gender, as that is already established by gender identity, but instead bring the individual's appearance, legal identity, and sex related characteristics into greater typical alignment with the individual's gender identity and lived experience.

33. Plaintiff is a transgender woman.

34. Plaintiff is a member of the protected class of sex.

35. Plaintiff has a diagnosis of gender dysphoria, is currently, and was at all relevant times to the allegations in this Complaint, under the care of various health care providers for gender dysphoria and gender transition related treatment.

36. Plaintiff was an employee of Defendant from on or about September 4, 2018 until on or about April 2020. As part of compensation for employment, Defendant provided its employees with health care coverage for such employees and their dependents through a privately funded plan administered by Blue Cross and Blue Shield of Kansas City. However, the aforementioned health care plan contained a categorical exclusion of all care related to gender dysphoria and gender reassignment. By categorically depriving transgender enrollees of coverage for the treatment of gender dysphoria—the clinically significant distress that can result from the dissonance between an individual's gender

7

identity and sex assigned at birth—Defendant unlawfully discriminated against Plaintiff because of her sex.

37. By categorically denying all coverage related to gender dysphoria and gender reassignment Defendant denied equal compensation for equal work to Plaintiff and other employees who are transgender, or who have transgender dependents.

38. The sweeping exclusion contained with Defendant's health care package denies coverage for health care, including counseling, hormone therapy, surgical care, and any other health care provided in relation to a person's transgender status and/or gender transition. This exclusion contravenes the well-established medical consensus that gender-confirming health care can be medically necessary and even lifesaving. Other plan enrollees who are not transgender do not face a categorical exclusion barring coverage for health care that is medically necessary for them based on their sex and receive coverage for the same care that is denied to transgender enrollees.

39. Covered services under Defendant's health care plan include medically necessary pharmacy benefits, menta health benefits, and medical care such as surgical benefits at inpatient and outpatient facilities.

40. At all relevant times, Defendant's health care plan has contained a categorical exclusion of coverage for transition related health care.

41. Because the only people who require treatments related to gender confirming health care are transgender people, denying coverage for such health care necessarily discriminates against transgender people.

42. As a result of the aforementioned exclusions in health care coverage, non-transgender enrollees receive coverage for medically necessary mental health, prescription drug, and

8

Case 5:20-cv-06134-NKL   Document 1   Filed 08/31/20   Page 8 of 17

surgical needs that, because of their sex, Plaintiff and other transgender employees or transgender dependents of employees of Defendant do not.

43. The medical consensus recognizes that discriminatory exclusions of gender confirming health care in health insurance plans have no basis in medical science. Preeminent medical and behavioral health organizations, such as the AMA and the APA, have called for an end to these exceptions.

44. In keeping with such medical consensus, Blue Cross and Blue Shield, the third party administrator of Defendant's health care plan, has maintained a Corporate Medical Policy on Gender Confirmation Surgery and Hormone Therapy that acknowledges the general medical necessity of this care since 2011.

45. Absent a categorical plan exclusion, claims for gender confirming care would be evaluated under the Blue Cross and Blue Shield criteria for individual medical necessity and covered under the plan in the same manner as any other claims for medical, mental health, or pharmacy benefits.

46. Absent the sweeping exclusion of transgender related treatment maintained by Defendant in its health care plan, Plaintiff's medical needs for gender confirming care while employed with Defendant would have been covered in the same manner as any other claim for medical, mental health, or pharmacy benefits as a non-transgender employee.

47. As a result of the sweeping exclusion of medically necessary health care coverage, Defendant's health care plan singles out employees, including Plaintiff, who are transgender, or who have transgender dependents, for unequal treatment by excluding medically necessary care for the treatment of gender dysphoria because of that person's

9

Case 5:20-cv-06134-NKL   Document 1   Filed 08/31/20   Page 9 of 17

sex and because such persons seek necessary medical treatment to change their sex to the one that matches their gender identity, and which is inconsistent with their sex assigned at birth.

48. Plaintiff has been denied coverage for medically necessary gender confirming health care because of her sex and because she is transgender, based on the categorical exclusion of gender confirming health care in Defendant's health care plan.

49. Plaintiff has been forced to either forego or delay medically necessary gender confirming health care and incurred financial hardship without the financial protection afforded by coverage through Defendant's health care plan.

50. Plaintiff has also suffered emotional distress, stigmatization, humiliation, and a loss of dignity because of Defendant's targeted discrimination against transgender enrollees, which wrongly deems Plaintiff's and other transgender persons' health care needs as unworthy of equal coverage.

51. The targeted discrimination against transgender persons by Defendant violates Title VII, section 1557 of the ACA, and the MHRA.

## CLAIMS FOR RELIEF

## COUNT I

### Violation of Title VII of the Civil Rights Act of 1964

### 42 U.S.C. § 2000e(f)

52. Plaintiff hereby re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 51 above.

53. Title VII provides that it is unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's sex.

54. Under Title VII, discrimination on the basis of sex includes discrimination based on transgender status and/or gender identity.

55. Defendant is an employer with the meaning of Title VII and therefore subject to Title VII.

56. By offering a health plan to its employees with categorical exclusions for gender confirming care, Defendant has and continues to discriminate on the basis of sex against Plaintiff and other enrollees who require gender confirming care, or whose dependents require gender confirming care.

57. By knowingly and intentionally offering health insurance that denies coverage to Plaintiff on the basis of her sex, Defendant harmed Plaintiff by: stigmatizing her; treating her as a secondary class compared to other non-transgender enrollees who have access to the same care for themselves or their non-transgender dependents; and causing Plaintiff and other transgender health plan participants mental and physical health complications due to their inability to access medically necessary health care.

58. By knowingly and intentionally offering health insurance that denies coverage to Plaintiff on the basis of her sex, Defendant further harmed Plaintiff by permitting Plaintiff to be paid less than non-transgender employees as Plaintiff was paying for insurance coverage she was unable to use, and thus denied compensation equal to the compensation received by non-transgender employees.

59. By knowingly and intentionally offering a compensation package that denies fringe benefits to Plaintiff on the basis of sex, Defendant has intentionally violated Title VII, for which Plaintiff is entitled to compensatory damages, including but not limited to out-of-pocket damages, consequential damages, and attorney fees.

## COUNT II

## Violation of the Patient Protection and Affordable Care Act

## 42 U.S.C. § 18001 *et seq*.

## BE SURE TO ALLEGE RECIPIENT OF FEDERAL FUNDING, ASSISTANCE AND OR FEDERAL CONTRACT

60. Plaintiff re-alleges and incorporates the allegations of paragraphs 1 through 59 of this Complaint as though fully set forth herein.

61. Section 1557 of the ACA, 42 U.S.C. § 18116 provides, in relevant part, that "an individual shall not, on the ground prohibited under … title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 *et seq.*)"—which prohibits discrimination on the basis of sex"—"be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any health program or activity, any part of which is receiving Federal financial assistance."

62. Discrimination on the basis of sex characteristics, gender, nonconformity with sex stereotypes, transgender status, and gender transition are all encompassed by the prohibition of discrimination on the basis of sex under Section 1557.

63. Upon information and belief, Defendant receives federal financial assistance and or has contracts with the United States such that it is a "covered entity."

64. A covered entity, such as Defendant, cannot provide or administer health care insurance coverage which contains a categorical exclusion form coverage for gender confirming health care, or otherwise impose limitations or restrictions on coverage for specific health services related to gender transition if such limitation or restriction results in discrimination against a transgender individual; i.e. because of that individual's sex.

65. Because Defendant receives federal funding that flows to health programs or activities, Plaintiff has a right under Section 1557 to receive health insurance through Defendant free from discrimination on the basis of sex, sex characteristics, gender, nonconformity with sex stereotypes, transgender status, or gender transition.

66. Defendant has discriminated against Plaintiff on the basis of sex in violation of Section 1557 and has thereby denied Plaintiff the full and equal participation in, benefits of, and right to bbe free from discrimination in a health program activity.

67. By categorically excluding all coverage for medically necessary treatment in conjunction with gender dysphoria and gender reassignment surgery, Defendant has drawn a classification that has unlawfully discriminated against Plaintiff based on her sex in violation of Section 1557.

68. As a result of the exclusion, Plaintiff has suffered harm, including but not limited to financial harm. By knowingly and intentionally offering health care coverage to Plaintiff that discriminated on the basis of sex, Defendant has intentionally violated the ACA, for which Plaintiff is entitled to compensatory damages, including but not limited to out-of-pocket damages, and consequential damages.

## COUNT III

**Violation of the Missouri Human Rights Act**

**RSMo. § 213.010** *et seq.*

69. Plaintiff hereby re-alleges and incorporates by reference the allegations contained in Paragraphs 1 through 68 above.

70. The MHRA provides that it is unlawful for an employer to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's sex.

71. Under the MHRA, discrimination on the basis of sex includes discrimination because of a person's failure to conform to gender based stereotypes, which includes a transgender person's transitioning from one sex to the other, thus not conforming to the stereotypes associated with their gender assigned at birth.

72. Defendant is an employer with the meaning of the MHRA and therefore subject to the MHRA.

73. By offering a health plan to its employees with categorical exclusions for gender confirming care, Defendant has and continues to discriminate on the basis of sex against Plaintiff and other enrollees who require gender confirming care, or whose dependents require gender confirming care.

74. By knowingly and intentionally offering health insurance that denies coverage to Plaintiff on the basis of her sex, Defendant harmed Plaintiff by: stigmatizing her; treating her as a secondary class compared to other non-transgender enrollees who have access to the same care for themselves or their non-transgender dependents; and causing

Plaintiff and other transgender health plan participants mental and physical health complications due to their inability to access medically necessary health care.

75. By knowingly and intentionally offering health insurance that denies coverage to Plaintiff on the basis of her sex, Defendant further harmed Plaintiff by permitting Plaintiff to be paid less than non-transgender employees as Plaintiff was paying for insurance coverage she was unable to use, and thus denied compensation equal to the compensation received by non-transgender employees.

76. By knowingly and intentionally offering a compensation package that denies fringe benefits to Plaintiff on the basis of sex, Defendant has intentionally violated Title VII, for which Plaintiff is entitled to compensatory damages, including but not limited to out-of-pocket damages, consequential damages, and attorney fees.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests that the Court enter judgment in her favor and against the Defendant on all claims as follows:

A. Enter a declaratory judgment that Defendants, including through enforcement of its health plan's categorical exclusion of treatment for gender dysphoria and/or gender confirming care, violated Plaintiff's rights under Title VII, the ACA, and the MHRA on the basis of Plaintiff's sex;

B. Preliminarily and permanently enjoin Defendant, their agents, employees, successors, and all others acting in concert with them from administering or offering health care coverage that categorically excludes coverage for gender confirming health care;

C. Award compensatory and consequential damages, including but not limited to back pay, lost benefits, and front pay, in an amount that would fully compensate Plaintiff for her financial harm, emotional distress and suffering, embarrassment, humiliation, pain and anguish, violations of her dignity, and other damages caused by Defendant's conduct in violation of the laws of the United States and the State of Missouri;

D. Award punitive damages for knowingly, intentionally, and willfully discriminating against Plaintiff in violation of the laws of the United States and the State of Missouri;

E. Award pre- and post-judgment interest;

F. Award Plaintiff her costs, expenses, and reasonable attorneys' fees incurred in this action pursuant to 42 U.S.C. § 1988, RSMo. § 213.111, and any other applicable laws;

G. Award other legal and equitable or injunctive relief as this Court deems just and appropriate;

H. The declaratory relief requested in this action is also sought against Defendant's officers, agents, servants, employees, and attorneys, as well as any other persons who are in active concert or participation with them.

### **Demand for Jury Trial and Designation of Place of Trial**

Plaintiff requests a trial by jury, in Kansas City, Missouri, on all counts and allegations of wrongful conduct alleged in this Complaint.

Respectfully Submitted,

LAW OFFICE OF MADELINE JOHNSON

/s/ *Madeline Johnson*
Mary Madeline Johnson, Mo. Bar # 57716
220 Main Street, Suite 201

Platte City, Missouri 64079
Telephone: (816) 607-1836
Facsimile: (816) 817-5507
Email: mmjohnsonlaw@gmail.com

ATTORNEY FOR PLAINTIFF